Filed 1/4/24; Certified for Publication 1/18/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| VENTURA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CRIMINAL JUSTICE ATTORNEYS ASSOCIATION OF VENTURA COUNTY et al.,<br><br>Defendants and Appellants. | 2d Civil No. B325277<br>(Super. Ct. No.<br>VENCI00546574)<br>(Santa Barbara County) |

After our Supreme Court's decision in *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032 (*Alameda*), the Ventura County Employees' Retirement Association (VCERA) adopted a resolution (the Resolution) excluding compensation for accrued, but unused, hours of annual leave exceeding employees' calendar year allowance ("leave cashouts") for purposes of calculating their

retirement benefits.  VCERA subsequently filed a lawsuit seeking a judicial declaration that its Resolution was legal.  The trial court ruled in favor of VCERA.  The Criminal Justice Attorneys Association of Ventura and Ventura County Professional Peace Officers' Association (collectively, Appellants) appeal the judgment.[1]  We affirm.

FACTUAL AND PROCEDURAL HISTORY

VCERA is a public retirement system established by Ventura County to provide retirement benefits to employees of the county and other local public entities, including Appellants. It is governed by the County Employees Retirement Law of 1937 (CERL) (Gov. Code,[2] § 31450 et seq.), the California Public Employees' Pension Reform Act of 2013 (PEPRA) (§ 7522 et seq.), and article XVI, section 17 of the California Constitution. VCERA is administered by a board of retirement (the Board) charged with implementing CERL's provisions.  (*Alameda*, *supra*, 9 Cal.5th at p. 1052.)

*Retirement calculations under CERL and PEPRA*

CERL governs the calculation of VCERA members' retirement allowances based on a statutory formula comprised of an employee's (1) age at retirement, (2) years of service, and (3)

---

[1] We granted the Retired Employees' Association of Ventura County, Inc., Regina (Renee) Artman, Scott Barash, Lyn Krieger, Mark Lunn, Roberto R. Orellana, Tracey Frances Pirie, Marty Robinson, and Chris Stephens's application to file an amicus curiae brief in support of Appellants.

[2] Further unspecified statutory references are to the Government Code.

2

final compensation.  (§§ 31676.01-31676.19.)  Only final compensation is relevant to this dispute.

For "legacy" members (employed by the county or another public retirement system prior to PEPRA's effective January 1, 2013, date)[3], final compensation is calculated based on an employee's "compensation earnable" during a representative period of their employment.  (§§ 31462, 31462.1.)  The representative period of employment is either a 12- or 36-month "final average compensation" period.  Legacy members with a 12-month final average compensation period are Tier 1 members (§ 31462.1, subd. (a)).  Legacy members with a 36-month final average compensation period are Tier 2 members (§ 31462, subd. (a)).

Section 31461 defines "compensation earnable" as "the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay." (§ 31461, subd. (a).)  In other words, it is the " 'average monthly pay . . . received by the retiring employee for the average number of days worked in a month by the other employees in the same job classification at the same base pay level.' " (*Alameda*, *supra*, 9 Cal.5th at p. 1058.)

When PEPRA became effective in January 2013, it revised laws governing pension plans and amended provisions of CERL. (*Alameda*, *supra*, 9 Cal.5th at pp. 1051-1052.)  As relevant here,

---

[3] Final compensation for "new members" who joined the retirement system on or after January 1, 2013, are governed by different statutes (§§ 7522.32, 7522.34).  The calculation of their retirement benefits is not at issue here.

PEPRA amended section 31461 by adding subdivision (b), which excludes certain items from compensation earnable (hereafter referred to as "PEPRA exclusions"). (Assem. Bill No. 340 (2011-2012 Reg. Sess.); Stats. 2012, ch. 296, § 28.) PEPRA now excludes from compensation earnable: "(2) Payments for unused vacation, annual leave, personal leave, sick leave, or compensatory time off, however denominated, whether paid in a lump sum or otherwise, in an amount that exceeds that which may be earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid"; and "(4) Payments made at termination of employment, except those payments that do not exceed what is earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid." (§ 31461, subd. (b)(2) & (4).)

*Leave cashouts*

A VCERA member may receive compensation for leave cashouts—accrued, but unused, hours of annual leave. A member's terms of employment (e.g., a Memorandum of Agreement or the County Management Resolution) limit the number of hours a member may cash out in a calendar year. The calendar year's allowance for leave cashouts varies depending on the employer and the employee's seniority, date of hire, bargaining unit, and title.

VCERA members may designate a 12- or 36-month final average compensation period that does not align with calendar years. Thus, the designated period may straddle two or four calendar years. For example, a Tier 1 member (those employees with a 12-month final average compensation period) may designate July 1 of year 1 to June 30 of year 2, or a Tier 2

4

member (those employees with a 36-month final average compensation period) may designate July 1 of year 1 to June 30 of year 4.

For legacy members, a member's compensation earnable includes compensation for leave cashouts during the 12- or 36-month final average compensation period. Before *Alameda*, a member's compensation earnable could include leave cashouts exceeding the member's calendar year allowance for leave cashouts. To illustrate, if a member designated a final average compensation period that aligned with the calendar year(s), that member could not cash out more than their calendar year allowance for leave cashouts. But, if a member designated a final average compensation period that straddled multiple years (two years for Tier 1 members or four years for Tier 2 members), that member could cash out leave exceeding their calendar year allowance within the designated period. For instance, if the calendar year's allowance for leave cashouts was 200 hours, a Tier 1 member could cash out 200 hours in year 1 and an additional 200 hours for year 2 for a total of 400 hours of leave redeemed during their final average compensation period.

*Alameda decision and the Resolution*

In July 2020, our Supreme Court decided *Alameda*, *supra*, 9 Cal.5th 1032. In *Alameda*, the plaintiffs (labor unions and other labor groups) challenged the amendments to CERL (i.e., the PEPRA exclusions under § 31461, subd. (b)) on the ground that the plaintiffs possessed (1) contractual or equitable rights to receive pension benefits and (2) a constitutional right to receive pension benefits according to the law as it existed prior to PEPRA. (*Alameda*, *supra*, 9 Cal.5th at pp. 1052-1053.) The court

upheld the PEPRA exclusions, concluding they did not violate contractual, equitable, or constitutional rights. (*Id.* at p. 1054.)

Thereafter, in October 2020, the Board adopted the Resolution in response to *Alameda*. The Resolution stated that *Alameda* "determine[d] that CERL retirement boards may not include items in retirement allowance calculations, either compensation earnable under section 31461, as amended, or pensionable compensation under section 7522.34, that the applicable statutes require them to exclude. [¶] . . . [¶] The Board hereby determines that the *Alameda* Decision and other applicable law require it to change its determinations of certain pay codes for . . . compensation earnable."

Following adoption of the Resolution, VCERA excluded from compensation earnable payments for leave cashouts that exceeded a VCERA member's calendar year allowance for leave cashouts. This exclusion applied to all retirement benefit payments made on or after August 31, 2020, (the date of the first issuance of retirement allowances after *Alameda* became final) to all VCERA members who retired on or after January 1, 2013, PEPRA's effective date. Any overpayments made to employees before the issuance of the *Alameda* decision were not recouped.

### The lawsuit

In its first cause of action, VCERA filed a lawsuit seeking declaratory relief that it had the "legal authority" to take the actions set forth in the Resolution with respect to the PEPRA exclusions.[4]

---

[4] VCERA alleged a second cause of action for declaratory relief with respect to other provisions in the Resolution. This second cause of action is not at issue in this action nor are the other provisions in the Resolution.

6

Leroy Smith, the former county counsel of Ventura County, filed a cross-complaint against VCERA for declaratory relief. Smith accrued 368.1 hours of annual leave per year, and his calendar year allowance for leave cashouts was 200 hours. As a Tier 1 member, Smith designated October 2019 to October 2020 as his final average compensation period. He cashed out 240 hours of leave: 40 hours in 2019 and 200 hours in 2020. VCERA only included compensation for the 200 hours of leave (his calendar year leave allowance) in determining Smith's compensation earnable. Smith's cross-complaint alleged a single cause of action for declaratory relief that VCERA had a legal duty to include cash payments for all 240 hours of leave in his compensation earnable for the purposes of calculating his retirement benefits.

The County of Ventura (the County) filed a complaint in intervention in Smith's cross-action. The County alleged one cause of action for declaratory relief, seeking a judicial declaration that "VCERA was not legally required to take the actions set forth in [the Resolution] . . . as it relates to annual leave cashouts that exceed what can be redeemed in a single calendar year."

The parties stipulated to resolving two issues by summary adjudication: (1) whether VCERA must exclude from compensation earnable annual leave cashouts exceeding the calendar year allowance for leave cashouts; and if so, (2) whether VCERA must exclude such leave cashouts from the calculation of retirement benefit payments to members who retired on or after January 1, 2013, the effective date of PEPRA's amendments to CERL.

The trial court granted summary adjudication in favor of VCERA. As to the first issue, the court found that for members with a 12-month final average compensation period (Tier 1 members), "VCERA must exclude from the calculation of retirement benefit payments all compensation for leave cashouts that exceed the maximum amount of leave that was earnable and payable to the member in either calendar year that began or ended with the member's 12-month measurement period." Similarly, for members with a 36-month period (Tier 2 members), VCERA must exclude leave cashouts that exceed the maximum amount of leave earnable or payable in "any three-calendar-year period that began or ended within the member's 36-month measurement period."

As to the second issue, the trial court concluded that "VCERA may exclude such leave cashouts from the calculation of retirement benefit payments made on or after August 31, 2020, to VCERA members who retired on or after January 1, 2013."

DISCUSSION

Appellants contend the trial court erred in interpreting subdivision (b)(2) of section 31461 as applied to legacy members—employees who began their employment before PEPRA's effective date. They argue that nothing in the statute's plain text or legislative history required the Board to exclude leave cashouts exceeding employees' calendar year allowance for leave cashouts from retirement benefit calculations. We conclude the trial court did not err.

The trial court's interpretation of a statute is a question of law that we review de novo. (*R & P Capital Resources, Inc. v. California State Lottery* (1995) 31 Cal.App.4th 1033, 1036.) When interpreting a statute, "our fundamental task is to

8

ascertain the Legislature's intent to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving terms their plain, ordinary meaning. If the language is ambiguous, we may look to extrinsic sources, including legislative history. We select the construction that comports most closely with the intent of the Legislature, with a view of promoting, rather than defeating, the general purpose of the statute, and avoiding an interpretation that would lead to absurd results." (*Fair Education Santa Barbara v. Santa Barbara Unified School Dist.* (2021) 72 Cal.App.5th 884, 898.)

In upholding the PEPRA exclusions, including section 31461, subdivision (b)(2), our Supreme Court in *Alameda* examined the legislative intent behind PEPRA and its amendments to CERL. (*Alameda*, *supra*, 9 Cal.5th at pp. 1059-1063.) The court observed that a bill analysis of the "pre-PEPRA version of Assembly Bill 340 explained that the purpose of these changes was to circumscribe CERL's 'very broad and general definition of "compensation earnable" ' in order to reduce pension ' "spik[ing]," ' the manipulation of an employee's pattern of work and pay to produce inflated compensation earnable during the final compensation period." (*Id.* at p. 1061.) Moreover, the court noted that a review of the PEPRA exclusions "demonstrates that the Legislature sought to limit pension spiking by eliminating practices that, while arguably permitted under the broad language of the preexisting definition, are inconsistent with the statute's overall concept of compensation earnable." (*Ibid.*)

In analyzing subdivision (b)(2) and (4) of section 31461, *Alameda* observed that in counties where an employee is permitted to cash out leave time, "compensation for cashed out leave time becomes 'compensation' for purposes of section 31460

9

in the year in which the cash value is received, which need not be the year in which the surrendered time was earned. This can lead to a distortion of the pension calculation when leave time awarded in a prior year is cashed out during the final compensation period, since this has the effect of adding remuneration for a prior year's service to the compensation received for service during the final compensation period. A similar problem arises with payments made upon termination of employment, excluded by section 31461, subdivision (b)(4), because such payments are generally also compensation for the surrender of accrued leave time. By limiting the amount of 'cash out' and termination pay that can be included in compensation earnable to the value of leave time 'earned and payable in each 12-month period during the final average salary period' [citation], the Legislature appears to have intended to prevent retiring employees from, in effect, including remuneration earned during prior years in the final compensation calculation." (*Alameda*, *supra*, 9 Cal.5th at p. 1062.)

*Alameda* also noted that "[p]rior to PEPRA's amendment, even in counties that limited the amount of leave time that could be cashed out in a calendar year, employees were able to double the amount of cashed out leave time received during a final compensation year by designating a final compensation year that straddles two calendar years . . . . By cashing out leave time in the second half of the prior calendar year and the first half of the subsequent calendar year, a retiring employee could double the amount of cashed out leave time received in the final compensation year. *By limiting the inclusion of cashed out leave time to that 'earned and payable' in a '12-month period,'*

10

*subdivision (b)(2) and (4) prevent this practice.*" (*Alameda, supra,* 9 Cal.5th at pp. 1062-1063, italics added.)

The Supreme Court clarified that although there was nothing "inherently abusive" about cashing out unused leave time outside the context of pension benefit calculations, "the pre-PEPRA definition of compensation earnable allowed an employee to considerably increase his or her pension benefit by . . . accumulating and cashing out a large quantity of unused leave time during the final compensation period. Because such enhancements are arguably inconsistent with the underlying concept of compensation earnable, which is intended to reflect pay for work ordinarily performed during the course of a year, these types of enhancement have been characterized as pension spiking." (*Alameda, supra,* 9 Cal.5th at p. 1063.)

We follow the Supreme Court's analysis of subdivision (b)(2) and (4) to conclude that amended section 31461 requires exclusion of compensation for leave cashouts that exceed the one (or three) calendar year's limits for such cashouts for purposes of calculating legacy members' retirement benefits. Designating a 12- or 36-month final average compensation period that straddles multiple years to receive compensation for leave cashouts greater than the amount a member could receive in one or three calendar years, respectively, is the type of manipulation that the PEPRA exclusions sought to eradicate. (See *Alameda, supra,* 9 Cal.5th at pp. 1062-1063.)

Appellants argue that our high court's statements in *Alameda* regarding the legislative intent behind the PEPRA exclusions are dicta. But when the Supreme Court has reached well beyond the holding necessary to its opinion to express its broader view, as it did in *Alameda,* dicta from the high court

11

should be followed.  (*Aviles-Rodriguez v. Los Angeles Community College Dist.* (2017) 14 Cal.App.5th 981, 990.)  In our view, the high court's statements in *Alameda* are persuasive.  We thus reject Appellants' argument that the Supreme Court's analysis regarding section 31461, subdivision (b)(2) was dicta.

Appellants contend the plain language of section 31461, subdivision (b) makes no mention of a "calendar year" and thus does not limit leave cashouts to what is earned and payable in a "calendar year."  But in our view, subdivision (b)(2)'s limitation of leave cashouts "in an amount that exceeds that which may be earned and payable in each 12-month period during the final average salary period" is ambiguous.  The final average compensation period may or may not be based on a calendar year.  This ambiguity is highlighted where, as here, an employer places calendar year limitations on leave cashouts.  Where there is ambiguity, we look to extrinsic sources such as legislative history.  As the *Alameda* court observed, the legislative history reveals the PEPRA exclusions were intended to eliminate pension spiking by "excluding income designed to artificially inflate a pension benefit" and "limiting the inclusion of other types of compensation that were reasonably viewed as inconsistent with CERL's general approach to pensionable compensation."  (See *Alameda*, *supra*, 9 Cal.5th at p. 1102.)

We must interpret section 31461, subdivision (b), to effectuate the Legislature's intent of eliminating pension spiking.  Thus, we interpret this statute to comport with the "underlying concept of compensation earnable, which is intended to reflect pay for work ordinarily performed during the course of a year."  (*Alameda*, *supra*, 9 Cal.5th at p. 1063.)  A member's compensation earnable during the final compensation period is

12

meant to reflect the *average* pay the retiring employee received. (*Id.* at p. 1058.) And, an employee's average pay during this compensation period includes payment for leave cashouts *that is subject to annual limitations*. Allowing members to avoid annual leave cashout limitations by designating a straddled final average compensation period does not comport with the concept of compensation earnable and is inconsistent with the legislative intent behind the PEPRA exclusions.

While we appreciate the impact of the Board's resolution on members' retirement allowances, we nonetheless conclude the Board was required to comply with section 31461, subdivision (b) and *Alameda* and exclude compensation for unused leave exceeding their calendar year allowances. "The task of a county retirement board is not to design the county's pension plan but to implement the design enacted by the Legislature through CERL." (*Alameda, supra,* 9 Cal.5th at pp. 1066-1067.) The Board had no authority here to "adopt or act on an interpretation [of CERL's provisions] that is inconsistent with those provisions." (*Id.* at p. 1067.)[5]

---

[5] Appellants do not challenge the trial court's resolution of the second issue—whether VCERA can exclude from compensation earnable leave cashouts that exceed annual cashout limitations for members who retired on or after January 1, 2013, PEPRA's effective date. Accordingly, we will not address this issue or disturb the trial court's ruling on this issue. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 555 [issues not raised in appellant's opening brief are deemed waived].)

## DISPOSITION

The judgment is affirmed. Respondent shall recover costs on appeal.


BALTODANO, J.


We concur:


GILBERT, P. J.


CODY, J.

Colleen K. Sterne, Judge

Superior Court County of Santa Barbara

_____

Rains Lucia Stern St. Phalle & Silver, Jacob A. Kalinski and Brian P. Ross for Defendants and Appellants.

Norman Dowler and Michael G. Walker for Retired Employees' Association of Ventura County, Inc., Regina Artman, Scott Barash, Lyn Krieger, Mark Lunn, Roberto R. Orellana, Tracey Frances Pirie, Marty Robinson and Chris Stephens as Amici Curiae on behalf of Defendants and Appellants.

Nossaman, Ashley K. Dunning, Aalia Taufiq and Alexander Westerfield for Plaintiff and Respondent.

Filed 1/18/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| VENTURA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CRIMINAL JUSTICE ATTORNEYS ASSOCIATION OF VENTURA COUNTY et al.,<br><br>    Defendants and Appellants. | 2d Civil No. B325277<br>(Super. Ct. No.<br>VENCI00546574)<br>(Santa Barbara County)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on January 4, 2024, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in judgment.

_____

GILBERT, P. J.        BALTODANO, J.        CODY, J.